STATE OF SOUTH CAROLINA              )    IN THE COURT OF COMMON PLEAS
                                     )
COUNTY OF GEORGETOWN                 )    FIFTEENTH JUDICIAL CIRCUIT
                                     )

WANDA CHARPING, AND                  )
GOVERNMENT ACCOUNTING                )    Case No: 2015-CP-22-01172
SOLUTIONS, LLC,                      )
                                     )
              Plaintiffs,            )
                                     )    **SECOND AMENDED**
        v.                           )    **COMPLAINT**
                                     )
TOWN OF ANDREWS, SUDAH PATEL,        )
CHRISTOPHER L. ANDERSON D/B/A        )
ANDERSON & ANDERSON ACCOUNTING       )
AND WEALTH MANAGEMENT FIRM,          )
EDDIE LEE, MAURETTA DORSEY,          )
KAYNNERA CAPERS, GREGORY M. LIPE,    )
AND LIPE & ASSOCIATES, LLC, RODNEY   )
GILES, ANGELA ANDERSON, PATSY        )
GREENE, AND MATTIE MCGEE             )
                                     )
              Defendants,            )
                                     )

COMES NOW, Plaintiffs Wanda Charping and Government Accounting

Solutions, LLC ("Plaintiffs"), amending their complaint filed on December 28, 2015,

and complaining of the Defendants as follows:

1.     This action arises out of events that occurred before and after the Andrews Town

Council meeting on April 1, 2015. One or more Defendants acting in concert individually and / or

on behalf of the Town of Andrews and under color of state law, beginning at least as early as

April 1, 2015, approved a proposal to have Defendant Chris Anderson, and his "associated team of

auditors," conduct a forensic audit of their books despite knowing that he was not a C.P.A., and

was not otherwise qualified to conduct such an investigation and further knowing that those same

1

books had already been audited by a C.P.A. firm in San Diego, California.

2.    Mr. Anderson had apparently been dropping the names of C.P.A.'s to the Andrews Mayor Giles and Council members, including Defendant Lipe, with whom he had a long-standing professional relationship, to address any concerns that his work would not be supervised by or otherwise subject to review by a qualified C.P.A. Mr. Lipe was complicit in this effort with Mr. Anderson, including attending the June 17, 2015 Special Called Meeting and later reviewing and approving an engagement letter to the Town for Chris Anderson on June 19, 2015. This engagement letter did not even remotely comply with the AICPA professional standards for this type of engagement.

3.    The engagement letter appeared to be written by Anderson on June 19, 2015, just two days after having appeared at an Andrews Town Council meeting on June 17, 2015, where his name and Lipe's name appear in the meeting minutes.

4.    At this same June 17, 2015 public meeting, one or members of council apparently instructed Chief Capers to "guard the door," which he did and later denied Plaintiff Wanda Charping access to the very public meeting where Chris Anderson was critiquing her professional work for the Town in a presentation to council members lasting well over an hour. Anderson focused his entire presentation on two different versions of an April 30, 2015 profit and loss statement that he alleged Charping had provided the Town and for which he alleged was sufficient grounds for the Town to retain him to conduct a "forensic audit" of Charping's work.

5.    Anderson's quest to take over Charping's book-keeping, accounting and consulting role with the Town has been described by Mr. Lipe as "relentless." Before and after Anderson and Lipe's proposed engagement was approved by the Town on June 22, 2015, Mr. Anderson apparently issued various versions of a report with his findings from his "preliminary

2

forensic audit," as he called it in the June 17 presentation for which Charping was unlawfully excluded in violation of her constitutional rights. At the conclusion of the Special Called Meeting on June 17, 2015, which the tape recording shows was apparently requested and led by Chris Anderson, the Town went into an Executive Session allegedly to address "Personnel Matters and the Public Works Department."

6.    Neither Anderson nor Lipe made any effort to comply with the AICPA general standards, standards for reporting or professional standards for field work although all were applicable and required for such a report. The Town acting through and on behalf of its council members and at least in-part relying on Lipe and Anderson's representations the Defendants named herein terminated the Plaintiff, and then subsequently contracted with Anderson, including by an engagement letter signed by Dorsey and Chris Anderson dated July 9, 2015.

7.    The Plaintiff had been the Town's book-keeper pursuant to a contract for approximately eight (8) years. One or more of these Defendants have conspired to harm Plaintiff and even planned to deny her access to a public meeting with the Chief of Police assigned to "guard the door," and thus have intentionally and recklessly caused stories to be printed and otherwise publicly disseminated that accuse Wanda Charping of taking money from the Town and being incompetent in her profession, despite knowing that she never had access to any of the Town's funds and the books and records were audited each year with no adjustments being made to her statements.

8.    To further mischaracterize and damage the Plaintiff and damage her good reputation, the Defendants also conspired and caused their own law enforcement officers to first, exclude the Plaintiff from the public meeting being held on June 17, 2015, by Defendant Capers, and later by traveling to Plaintiff's residence in Chapin, South Carolina, in their Andrews police uniforms, allegedly to obtain records of the Town, despite knowing that all records had already

3

been provided by Wanda Charping.

9.     Lipe apparently soon realized that Anderson's primary objective was to take Charping's job, still he knowingly set aside all professional standards paving the way for Anderson and the other Defendants' malicious efforts to publicly ruin Charping in favor of the known unqualified Anderson.

10.     At least as early as June 24, 2015, Anderson informed Lipe of a complaint investigation by LLR of Anderson for performing and certifying accounting work in violation of applicable law. Relying on the history of their relationship, Anderson apparently enlisted Lipe to help him "word" his reply to LLR and provide "choice wording" during this engagement with the Town.

11.     Lipe, although required by the AICPA to maintain independence in mental attitude in all matters related to an audit, continued to ignore applicable professional standards and continued to assist Anderson and the other Defendants in their effort to ruin Charping instead of conducting a genuine limited scope audit, even though he knew by this time that Anderson had no competent evidence to support any claim of theft or incompetence against Charping, and had told Anderson prior to the June 17, 2015 meeting that he found nothing suspicious about the subject matter that Anderson railed on Charping for well over an hour on June 17, 2015 prior to *effectively begging* the Town at the conclusion of the June 17, 2015 Special Called Meeting to hire him to do a forensic audit for which he was not even qualified to do, and for which Lipe later admitted in his September 23, 2015 letter that he was not qualified to do either as he lacked experience in municipal accounting.

12.     Capers was at the June 17, 2015 meeting and expressed his support of Chris Anderson and C. Anderson's request to be hired to conduct a forensic audit of the Town's books. This was after he had removed Wanda Charping in the clerk's office, shut the door behind her and told her someone would come and get her. This was also, on information and belief, in response to Capers' realization or belief that

4

Wanda Charping stood in the way of his quest to be paid overtime, despite his being a Department Head and a salaried employee.

13.    Lipe knew that Charping was indeed Chris Anderson's target. Anderson, and other Defendants were determined to remove Charping as book-keeper for the Town using whatever means. The actions and statements of the Defendants as further set forth herein in making and causing to be made numerous false and misleading statements about Plaintiffs are defamatory and actionable *per se*, and have caused extensive and substantial and permanent damages to the reputations of the Plaintiffs, as well as lost business, profits, general and special damages as will be proven at trial.

14.    One or more Defendants have also refused in bad-faith for months to provide Plaintiff with documents responsive to a Freedom of Information Act ("FOIA") request, despite the fact that others have received the very documents by a FOIA request that have not been provided to Plaintiff.

## PARTIES / VENUE

15.    Plaintiff Wanda Charping ("Charping") is a resident of Richland County, South Carolina and has been for years. Plaintiff Government Accounting Solutions, LLC ("GAS") is a corporation organized and existing pursuant to the laws of the state of South Carolina and a registered certified public accounting firm in South Carolina.

16.    Defendant the Town of Andrews ("Town") is a local government operating and located in Georgetown County, South Carolina.

17.    Defendant Sudah Patel ("Patel"), is a current member of Town Council and, on information and belief, is a resident of the state of South Carolina and Georgetown County, and

at relevant times in this matter was acting under color of law.

18.    Defendant Christopher L. Anderson, d/b/a Anderson & Anderson Accounting and Wealth Management Firm ("Anderson"), on information and belief, is a resident of the state of South Carolina and Georgetown County, and Anderson & Anderson Accounting and Wealth Management Firm Anderson & Anderson Accounting and Wealth Management Firm is an unincorporated association or sole proprietorship operating in Georgetown County, and at one or more relevant times in this matter was acting under color of law.

19.    Defendant Eddie Lee ("Lee"), is a current member of Town Council and, on information and belief, is a resident of the state of South Carolina and Georgetown County, and at relevant times in this matter was acting under color of law.

20.    Defendant Mauretta Dorsey ("Dorsey"), is the Administrator for the Town and, on information and belief, is a resident of the state of South Carolina and Georgetown County, and at relevant times in this matter was acting under color of law.

21.    Defendant Kaynnera Capers ("Capers"), is the current Chief of Police for the Town and, on information and belief, is a resident of the state of South Carolina and Florence County, and at relevant times in this matter was acting under color of law.

22.    Defendant Gregory M. Lipe ("Lipe") is a Certified Public Accountant, licensed to practice throughout South Carolina and on information and belief, is a resident of the State of South Carolina and Florence County. Defendant Lipe & Associates, LLP ("Lipe, LLP"), on information and belief, is a licensed Accountancy firm in South Carolina located and operating in Florence County.

23.    Defendant Rodney Giles ("Giles"), was the Mayor for the Town in 2015, and,

6

on information and belief, is a resident of the state of South Carolina and Georgetown County, and at relevant times in this matter was acting under color of law.

24.    Defendant Angela Anderson ("Ms. Anderson"), was on Town Council in 2015 and, on information and belief, is a resident of the state of South Carolina and Georgetown County, and at relevant times in this matter was acting under color of law.

25.    Defendant Patsy Greene ("Greene"), was on Town Council in 2015 and, on information and belief, is a resident of the state of South Carolina and Georgetown County, and at relevant times in this matter was acting under color of law.

26.    Defendant Mattie McGee ("McGee"), was on Town Council in 2015, remains on Town Council as of the filing of this Second Amended Complaint, and, on information and belief, is a resident of the state of South Carolina and Georgetown County, and at relevant times in this matter was acting under color of law.

27.    Venue and jurisdiction are proper in this County and in this Circuit because one or more of the defendants resides in or conducts business in Georgetown County.

## FACTUAL ALLEGATIONS

28.    Wanda Charping has been a Certified Public Accountant ("C.P.A.") for over thirty (30) years. She has been licensed to practice as a C.P.A. in South Carolina since 2006 and in the state of Ohio since 1983.

29.    Charping's office has been in the Columbia, South Carolina (Chapin) area since 2006. Her business is bonded and insured and she has never had any claims filed against her or otherwise had any significant disputes with her clients until now.

7

30.     Charping's C.P.A. practice is focused on servicing public entities and local governments like the Town, specifically in municipal accounting and finance.

31.     Charping has established an excellent reputation for book-keeping, accounting and financial services to public entities, which are governed by the standards known as the Governmental Accounting Standards Board ("GASB").

32.     As a result of her reputation in the industry, Charping has been recommended to many clients from numerous reliable sources for years.

33.     In or around June or July of 2007, the Town was near bankrupt and otherwise in desperate need of the services of someone with Charping's experience and skills, and she was recommended to the Town for such services by the Municipal Association of South Carolina ("MASC").

34.     With the assistance of Charping, the Town was put on a budget, sold some assets and resolved a dispute with the IRS of approximately $300,000.00. After a few years under the assistance of Charping, the Town had a healthy fund balance.

35.     Every year that Charping has done work for the Town, the Town's financial reports were audited by and auditing firm selected by and appointed by the Town's council. Each year, no correcting entries were cited by the auditors to alter the financial statements provided by the Plaintiff.

36.     All Defendants knew or should have know that the Town's financial records were audited every year that Charping had been doing work for the Town without any corrected entries by the auditors.

37.     In the past few years, however, the Town has run through this fund balance and has begun to again incur deficits. For example, the Town has been increasing its headcount of employees, and incurring unbudgeted overtime while operating costs and debts for the sewage system were also increasing and becoming uncontrollable. Other examples include the Town recently paying a $50,000 fine to S.C. Department of Health and Environmental Control ("DHEC") because they apparently did not even open their mail to know of the need to respond to a citation from DHEC.

38.     The Town has also recently made large purchases with cash instead of financing, spent on unbudgeted items, inexplicably failed to collect approximately $260,000 in property taxes, and incurred approximately $80,000 in unbudgeted operations charges to the City of Georgetown.

39.     Because of the facts described in the preceding paragraphs, the Town had again put itself in a position where they were having difficulty paying their bills when they became due. On information and belief, the Town was not making payments to the retirement fund account for the benefit of its employees.

40.     At the Budget Workshop portion of the Town's public meetings occurring on June 17, 2015, according to the meeting minutes and after the Mayor and Council came out of their Executive Session to discuss "Personnel Matters and the Public Works Department," Charping advised the Mayor and Council that "Council needs to cut the budget by $300,032.00 to balance the budget."

41.     Then Chief Capers disputed this statement by Charping, and in response accused her accounting of being all wrong, apparently in fear that he would not prevail in his quest to be paid overtime.

42.    In a recent news article regarding the Town's finances, dated May 25, 2016, it is reported, "The Town of Andrews is facing a $378,768 budget deficit for the 2016-2017 fiscal year."

43.    Every year that Charping provided services to the Town, the primary aspects of her engagement in the book-keeping can be described as follows: (i) Town sends Charping an email with an image of an invoice to pay that she receives in Chapin; (ii) Charping saves the image and associates it with an entry she creates in QuickBooks; (iii) Charping sends the Town an electronic picture of a check which the Town's staff then prints in Georgetown County; and (iv) the Town has two authorized persons sign the printed checks and mails or otherwise delivers to the payee.

44.    Charping has never once signed a check from the Town, and all members of the Town Council and the Administrator know or should know this.

45.    All cash and receipts of the Town are received by the Town in Georgetown County and deposited without the involvement of Charping. Charping has no access to any Town credit cards or accounts other than as described above.

46.    On information and belief in or around the first few months of 2015, Defendants Anderson and Patel began working together on a project known as the Andrews Heritage Festival.

47.    In or around February or March of 2015, Defendant Anderson began attending the scheduled meetings of the Town Council. As will be shown by the emails in the case, Anderson routinely communicated with Defendants Patel, Dorsey and Capers, not directly with (or even copied to) the Mayor or other members of the Council.

10

48.     At the regularly scheduled Town Council meeting on April 1, 2015, Defendant Chris Anderson stood up and essentially preached about how he wanted to do an "investigation," into the Town's books as a "concerned citizen." As a result of this gratuitous request by Anderson, on April 1, 2015, the Town Council voted to allow Anderson to do a "forensic audit," despite knowing he was not a C.P.A.

49.     On information and belief, Anderson and Lee were each members of a citizens group that referred to themselves as "concerned citizens," and which went about in the community spreading stories about the Town, its finances and Charping's work.

50.     Initially and in a subsequent email dated April 2, 2015, sent at approximately 3:30 P.M., Anderson represented he was doing this work as a "concerned citizen" for no charge, but later on June 12, 2015, he presented an invoice to the Town to be paid for these same services in an amount of $577.50, for "Forensic Auditing including Compilation and Diagnostics of selected financial source documents," representing 7.7 hours at $75.00 per hour. On information and belief, this invoice was paid by the Town.

51.     On April 2, 2015, less than 24 hours after the request was made by Anderson and upon her receipt of email confirmation from the Town Administrator authorizing the release of the data, Charping provided Anderson with all of the information from her QuickBooks records for the Town electronically. After providing this information, Charping continued to respond in good- faith to follow up requests for "reports" from the QuickBooks data she had already provided.

52.     In an email response to Charping dated April 2, 2015, apparently before he had reviewed any of the information provided related to the Town's finances, Anderson

11

stated:

> Earlier this afternoon, I conferenced with Greg Lipe [C.P.A.], Karen Currin [C.P.A.], and our associated team of auditors. My firm will thoroughly review all documents as sent.
>
> As stated in the email above, "You can add, change delete or do anything else you please to anything in this file;" this statement will be noted. **It is not the position of my firm to make any revisions or alter any financial documents as sent from your office. WE WILL REVIEW THEM AS SENT**. Please understand my position, I am not rendering paid professional services to the town of Andrews. I am a concerned citizen reviewing public documents that are at my disposal. I really need to fully comprehend why the Town is in the financial position it is in; however, should anything within my
> review disclose financial errors, irregularities, or illegal acts such as fraud or misappropriation which may or may not exist (forensic auditing as you termed it in yesterday's meeting), I will inform you, town council and depending on the infraction, I will report my finding to the appropriate entities.
>
> Again I really appreciate your full cooperation and I look forward to sending all interested parties a copy of my findings.

(bold and underlining in original, square brackets added to show C.P.A.'s).

53.    On or about May 26, 2015, after Anderson has been hired by the Town to do his initial *free / concerned citizen* "forensic audit," Dorsey sends an email to the Town's auditors regarding an allegation of Anderson's alleging payroll theft. Dorsey is copied on this email from Anderson, but not Charping.

54.    On May 27, 2015, the Town's auditor responds to the email copying Charping. On May 29, 2015, Charping responds to the email from the auditor and advises that for the time period in question and due to the check stock printing company, the check stock for the payroll account was printed with the general fund bank account number instead of the payroll account bank number, "the payroll was paid from the general account rather than the payroll account."

55.    During this time, an employee of the Town was fired based upon the accusations of theft by Anderson, but later rehired once the simple printing explanation was provided.

56.    The above described firing of the employee over a simple question that Charping could have answered and did eventually answer explains why one or more of the Defendants did not want Charping in the June 17, 2015 Special Called Meeting, namely because she could have easily responded to the accusations being unknowingly hurled at her and her professional work by Anderson, but instead was asked to leave the public meeting by the Mayor who was presiding over same (with Anderson), placed in the Mayor's office, and later escorted into another room by Capers who shut the door. The Defendants denied her the right to attend to the June 17, 2015, public meeting, specifically the Special Called Meeting, that took place mostly in the morning hours before Council went into Executive Session.

57.    In fact, the meeting minutes for the June 17, 2015, meeting which the Plaintiff has only recently obtained (not by FOIA response from the Town), but from another source, open up as follows:

Mr. Anderson introduced to Mayor and Council, Mr. Gregg Lipe a Certified Public Accountant of Lipe & Associates LLC from Florence, SC. Mr. Anderson stated to Council that they received a P&L Statement on Thursday, May 21 2015 from the Town's CPA, Wanda Charping that was presented as year to date as of April 30, 2015. Seven days later on May 28, 2015 at the Special Called Meeting/Budget Workshop Council received another P&L Statement/Budget Worksheets dated as of April 30, 2015 from Ms. Charping. Mr. Anderson went on to say that in his reviewing of the two P&L Statement he saw that the Administration Department was showing a $75,000.00 deficit and is prompted him to perform a preliminary review of the Town's accounts.

58.    At this June 17, 2015, public meeting, Anderson gave the prayer / invocation and unbelievably stated as follows: "let us reason with one another."

59.    Apparently, Charping and her professional work for the Town since 2007, who was known by Anderson and the other Defendants to be the very subject of the June 17, 2015 meeting requested and coordinated by Anderson, was not intended to be included in the Defendants' universe of persons entitled to be part of this particular *public debate* about the Town's finances.

60.    On June 17, 2015, Defendant Anderson apparently presented a "report" of findings from his and Lipe's *investigation / forensic audit* in what Charping was led to believe was a closed door Executive Session of the Town Council, but actually was a Special Called Meeting allegedly with notice to the public, and open to the public, and in which Charping was excluded from attending by the Mayor, Defendant Capers, and the other officials present in that morning's public meeting.

61.    Despite their practice to cover the events of the Town of Andrews and its council meetings, the South Strand News apparently did not make it to this all day June 17, 2015, Special called Meeting, Executive Session and Budget Workshop.

62.    On information and belief, the South Strand News did not receive notice of these Town of Andrews June 17, 2015, public meetings.

63.    On information and belief, the Defendant Police Chief K. Capers, Defendant Mauretta Dorsey and other persons, including the general public, and members of Town Council attended and participated in this first public meeting of Council on June 17, 2015.

64.    Also on June 17, 2015, and immediately after the above session, an Executive Session was convened where on information and belief, the council discussed the termination of the Plaintiff.

14

65.    Then the Town once again reconvened in a public town hall council meeting called a "Budget Workshop," where Charping reported to the Town Council on the issue of their "budget," and again explained that the Town's spending could not continue at the current pace, specifically noting the increasing costs of providing sewage treatment services.

66.    In response to this report by Charping, Defendant Capers, after having just heard Anderson and Lipe's "report" in the meeting from which Charping was excluded, stood up and publicly accused Charping's "accounting" work of being "all wrong," despite not providing any specifics and knowing, or should have known, that all her accounting work had been audited by independent auditors with no issues whatsoever since she began working for the Town in 2007.

67.    The above statement made by Chief Capers constitutes defamation *per se* as it publicly accuses Charping of being incompetent to perform her profession as a C.P.A.

68.    Capers was repeating the defamatory statements of Anderson that he was allowed to hear in the first public session on June 17, 2015, a public meeting for which he and the other Defendants intentionally excluded Charping from attending.

69.    The Council did not direct any questions to Charping regarding Anderson's allegations or findings during this regular public session on June 17, 2015, which Charping was excluded from attending by Chief Capers who seized her and eventually placed her in a closed room and told her "someone would come and get you."

70.    Having attended the June 17, 2015 meeting of Council and undoubtedly discussed the matters with Anderson before and after, Lipe knew or should have known by June 19, 2015, that the target of Anderson's *witch hunt* was Charping.

15

71.    If Lipe did not realize this on June 17, 2015, he certainly did shortly thereafter, but still did nothing to stop Anderson and the other Defendants in their obvious quest to discredit and destroy Charping. On information and belief, Lipe actually warned Anderson that he did not see any issues with any of Charping's work, yet Anderson, with encouragement from the other Defendants, continued to blaze his trail in seek of Charping's job, status and to attempt to destroy her good reputation no matter the consequences.

72.    Two days later, on Friday, June 19, 2015, in an email to Anderson, Lipe approves Anderson's proposed engagement letter to the Town, stating, "Looks really good. Maybe a few minor changes, but probably not. When do you submit it to the Town?" Anderson responds and states, "Submission will occur on Monday." Nine minutes after receipt of the "looks good," email from Lipe, Anderson forwards that email to Defendants Dorsey and Capers and states, "See the above response from the C.P.A.," to induce their reliance on his claim that he was in association with and under the auspices of a C.P.A. and accordingly all work performed would be in accordance with Generally Accepted Auditing Standards ("GAAS") even though it wasn't stated as such, it was required because Lipe is bound by those standards.

73.    The client (Town of Andrews) then relied on that belief, as they had a right to do, and on Monday, June 22, 2015, the Town executed an engagement letter with Defendant Anderson and Defendant Lipe.

74.    Lipe is licensed in South Carolina as a C.P.A. to perform accounting and related attestation services while Anderson is not. The engagement letter itemizes the agreed upon procedures to be performed by Anderson and describes the scope of services to be provided by Lipe and Lipe, LLC to include attesting as an "independent" accountant to

Anderson's work product. Lipe and Anderson were obligated to provide the Town with an "independent" investigation in all respects.

75.    Independence requires the reviewer to not approach the work or allow those supervised to approach the work effort with any preconceived notions. Their obligation was to obtain credible evidence of a client's assertion, and not blindly pursue their own assertions or those of others. Apparently Anderson recognized his anticipated allegations of theft would be more believable if one or more real C.P.A.'s were to lend credibility to his work and Mr. Lipe was apparently willing to do so for a fee of $3,000.00. The associated hours and fees for Lipe's services are specifically listed in this engagement proposal from Anderson, and obviously relied upon by the Town. On July 6, 2015, Anderson sent an email asking for Lipe's comments on the documents he had received from Anderson.

76.    On information and belief, Lipe failed to perform any acts of due diligence throughout the period of his engagement. There is no evidence that the professional standards of field work were applied especially those requiring an understanding of the entity and its environment, including its internal control or obtaining sufficient and competent evidence to afford a reasonable basis for any conclusion much less supporting Anderson's claims of theft and incompetence on the part of the Plaintiff.

77.    On information and belief, one or more or both of Anderson and Lipe disseminated a report to numerous third-parties that they knew to be closely associated with the Plaintiffs' business, or that would report their allegations publicly including the South Carolina Board of Accountancy.

78.    On June 26, 2015, the Town called another Emergency Called Meeting and

17

went into Executive Session.

79.     On information and belief, it was a this June 26 Emergency meeting that the Mayor and Council, at the urging of Anderson and others, voted to terminate Charping and retain Anderson to do a forensic audit of Charping's work based upon his *ex parte* presentation on June 17, 2015, and subsequent assurances to Dorsey and the Town that he was in fact working with C.P.A.'s, including Lipe.

80.     Anderson claims to have been appointed as the Interim Bookkeeper for the Town on June 28, 2015. On June 30, 2015, counsel for the Town sent a letter to Charping advising her that the contract for services between the Town and her company, Plaintiff GAS, was being terminated, effective immediately.

81.     On July 10, 2015, South Strand News, a/k/a Georgetown Times, a/k/a Waccammaw Times, a/k/a Inlet Outlook (hereafter "South Strand") reported that in excess of $75,000.00 was missing from the last fiscal year for the Town, referring to the time period that Charping's book-keeping was at issue. The article was entitled, "Andrews City Council special meeting causes conflict between councilwoman, citizens," and includes the following text in this sequence: "Anderson was appointed after former Certified Public Accountant Wanda Charping was terminated on June 26. Anderson said that he could not insinuate any fraud or irregularities, though he called the discrepancy 'a very serious issue.'"

82.     The next paragraph in the July 10, 2015, article states, "'I presented (the Council) my findings, and ever since then, they won't let me complete the inspection, and I do want to complete the inspection because there's a considerable amount of money unaccounted for in excess of $75,000 from the last fiscal year.'"

83.    The final sentence of the July 10, 2015 article states, "'I can't even begin to tell you the magnitude behind this,' Anderson said," referring to the accounting and time period that Charping was the Town's bookkeeper.

84.    In another newpaper article dated July 28, 2016 entitled "disagreements between mayor, council affect Andrews' finances," it is reported that the mayor is withholding [financial documents] because Anderson is not a licensed CPA. The article adds that, "Part of the financial quagmire is the result of the June 26 termination of Wanda Charping, the town's former CPA, Anderson who is with Anderson & Anderson Wealth Management Firm, said he was hired as the interim bookkeeper on June 28. According to Anderson, the town may have more than $75,000 missing from last fiscal year." This is a false statement.

85.    On July 27, 2015, despite knowing they already had all of Charping's records, and had given copies of the records to others including another local accountant, the Town sent an Andrews uniformed policeman to Charping's home *allegedly* to deliver a final check for services and, *allegedly*, to get yet another copy of the books she had already provided on April 2, 2015.

86.    One or more Defendants ensured that this misleading and unnecessary circumstance of sending a uniformed Andrews policeman to Chapin to Charping's house was reported in the local papers on July 31, 2015, in an article entitled, "Debate over Andrews finances put at bay," suggesting to the public that Charping was being uncooperative and further that police action was required. The article in question stated:

"This is a mess," said Councilwoman Patsy Greene, who directed accusations at Anderson, who owns Anderson & Anderson Accounting and Wealth Management

19

firm and was hired July 9 to take over accounting duties for the town following the termination of Wanda Charping, a certified public accountant who still held the town's financial records until an Andrews police officer retrieved them from her last week.

87.    Requests for retraction and apologies sent to the Town and to South Strand newspaper by counsel to Charping were never acted upon. A written request was sent to the Town in early August, 2015, and another to South Strand on September 4, 2015.

88.    This same July 31, 2015 article quoted Defendant Lee stating with respect to Defendant Anderson, "'He did not make the mess now,' Lee said. 'He just discovered the mess. He's just like Christopher Columbus – he discovered it.' His statement drew laughter from the crowd."

89.    Based upon Anderson's written "report," or other written or verbal reports to the Town, Lee and others accepted that Charping's professional work was incompetent, faulty and wrong, all of which he should have known was baseless and false.

90.    Since then, all of Anderson's reckless allegations have been proven false by his inability to provide documentary support.

91.    The July 31, 2015, South Strand news article went on to report: "The body also agreed it would like Charping to come before the group and explain any confusions or mistakes in her previous work for the town that Anderson may find," continuing to falsely suggest that her professional work was improper or incompetent.

92.    On July 28, 2015, South Strand published an article entitled, "Disagreements between mayor, council affect Andrews' finances." Charping is again referred to as having

been terminated on June 26, 2015, and Anderson is stated to have become the Town's Interim Bookkeeper on June 28, 2015.

93.    In the July 31, 2015, article published by South Strand, it is reported that Anderson on behalf of the Town has now published the "findings report" he presented to Town Council on June 17, 2015, to numerous third-parties, including but not limited to the South Carolina State Ethics Commission, the Town's auditor, the Municipal Association of South Carolina, The South Carolina Department of Administration, and SLED. The Plaintiff had existing professional relationships with these agencies and third-parties.

94.    The above article states that Anderson said he believes as much as $75,000 could be missing from the town. Both Councilwoman Patsy Green and the Mayor had questioned Anderson's credentials, in particular that he was not a C.P.A. Also during the meeting Anderson and Councilwoman Sudha Patel asked for the books to be returned into Anderson's custody. Green expressed her disagreement by directing her comments to Anderson. "We need a C.P.A. to carry us through whatever we're going through, because this is a mess.... People are being accused of stealing. I don't feel you should handle our books." Despite Lipe being engaged by this time, Councilwoman Green was still not convinced that Anderson was competent and Lipe was nowhere to be found.

95.    On August 5, 2015, South Strand reports that Ms. Patel issues a public apology to Defendant Anderson and the people of the Town, saying, "Mr. Anderson was welcomed with open arms by the Mayor and Town Council members and was later hired. I wish to sincerely apologize on behalf of a few of my counterparts for unprofessional behavior and creating a hostile work environment." After that meeting, when the Council adjourned, they posed for a group picture.

21

96.    On August 26, 2015, South Strand published yet another article, this one entitled, "Adviser: 'Secret' financials problem for Andrews," continuing to suggest impropriety by Charping related to "secret financials." A caption to the article states, "Andrews chief financial adviser Chris Anderson describes irregularities in the town's financial records at the town council meeting on Aug. 20."

97.    The August 26, 2015, article further stated, "The Town of Andrews' financial adviser told the town council the South Carolina Law Enforcement Division could investigate irregularities in the town's finances, saying 'secret deductions' from payroll checks and inaccurate budget projections have resulted in more than $75,000 in financial discrepancies."

98.    These statements are false. The Town Administrator was responsible for providing all information regarding payroll deductions.

99.    This same August 26, 2015, article goes on to quote the Town's Interim Bookkeeper as follows:

> "SLED contacted me and said that after reviewing my initial findings," Anderson said to The Georgetown Times after the meeting, "they will be waiting on a report from council to move forward with an investigation. Based on my initial findings, they feel like they will be inclined to bypass the normal process of a forensic audit and go straight to the State Solicitor with the information."

100.    In the August 26, 2015, article, South Strand states it attempted to corroborate this information with SLED but apparently could not.

101.    Continuing in the same August 26, 2015 article, South Strand reports that "even if council does request an investigation by SLED or other law enforcement agencies, Anderson said he will continue to begin work on the 2015/2016 budget 'from scratch,' a

22

decision made after discussing the scenario with a certified public accountant and the town administrator." On information and belief, the C.P.A. referred to is Defendant Lipe demonstrating his continued presence at the Town of Andrews on that date and their continued reliance on his professional credentials.

102.    Continuing in the article on August 26, Anderson is going on about Ms. Charping's accounting irregularities and states, "in some instances the books appear to have more money than they should and in other instances they appear to have less money than they should." This is a false statement and is defamatory.

103.    Also, sometime prior to August 26, 2015, Dorsey falsely told the South Strand News that Charping was terminated due to a state provision limiting contracts to a period of years, and she and Anderson were quoted as follows:

> *Anderson said he first discovered discrepancies earlier this summer when the town council hired him to be its financial adviser, following the June 26 termination of Wanda Charping who had been the town's accountant for nearly 10 years. Town Administrator Mauretta Dorsey said Charping was terminated due to a state requirement limiting the term of outside contracts.*

104.    On September 4, 2015, South Strand published yet another article entitled, "Andrews Council exploring $43,000 budget deficit discrepancy." In this article, South Strand reports as follows:

> During the meeting, Anderson recommended the council request its former accountant, Wanda Charping, to appear in person to explain the difference in the deficit numbers.
>
> "When will we set the appointment for Miss Wanda (Charping) to come and bring us some explanations to the irregularities that are found in the town records?" Anderson asked. "Council does need to set a date for that."
>
> Councilwoman Patel agreed.
>
> "I think that's a good point," she said. "That needs to be one of the next natural

23

steps."

105.    On September 23, 2015, apparently after being made aware of Plaintiff's intention to sue, and that there was another investigation into Anderson's work on behalf of the Town or others and as associated with Lipe, Lipe wrote a letter to the Town, stating:

> Dear Mauretta:
>
> This is to notify the Town of Andrews, SC that it was never my intention to provide direct supervision for Chris Anderson with respect to any accounting or bookkeeping services he may have been engaged to perform for the Town of Andrews, SC.
>
> I sincerely apologize if I mislead Chris Anderson, and in turn, caused him to mislead the Town of Andrews, SC.
>
> I do not possess the necessary governmental accounting experience to provide the level of expertise and supervision that may be required by the Town of Andrews, SC.
>
> Yours truly
>
> Gregory M.
>
> Lipe

106.    On information and belief, the Defendants once made aware of this "apology," for being "misled," did nothing to make it public or to otherwise attempt to restore the good reputation of Charping. Lipe knew Anderson from prior engagements together where Anderson had performed accounting services in conjunction with Lipe and Lipe's supervision of same. Lipe had adequate time to assess Anderson's professional skill level and competence. Lipe knew or should have known that Anderson's efforts were directed at Charping and could have and should have taken steps to publicly remove himself from Anderson and his association with Anderson in relation to Anderson's "forensic audit," of the Town's books before damages occurred or taken steps to mitigate damages to both his client and Plantiff.

107.    Lipe's failure to adequately supervise Anderson after knowing specifically what Anderson was attempting to do, and disregard for the application of professional

24

standards required of a C.P.A., constitutes recklessness and gross negligence, in breach of his duties to the Town and to Charping as a fellow C.P.A. and as an obvious target of Anderson and the other Defendants' efforts.

108.    Lipe confesses above to knowing of his "misleading" behavior. He induced the client to engage even though he had no intention to perform his duty and did not perform according to the minimum general standards, standards of field work, or standards of reporting. (That comprises all of the standards.) He "lent" his license to Anderson so Anderson could behave in an egregiously fraudulent manor with regard to the Town and gain financially.

109.    On September 25, 2015, South Strand reports that Defendants Patel and Anderson used similar public accusation tactics against the Mayor of Andrews as used against Charping.

110.    The media reports that Councilwoman Patel said in a Sept. 19, 2015, interview that police were called in to help with a retrieval of a lawnmower from the Mayor. The Mayor said he was confused that the Council had asked Anderson, rather than the Town's attorney, for advice on writing a letter asking him [the Mayor] to resign for theft.

111.    On information and belief, Patel and Anderson then reported the so-called lawnmower theft to the newspaper. The Mayor claimed he was repairing the mower and everyone knew it. In that same article, the residents complain about closed and unlawful meetings among members of council. The newspaper reports the opinion of the South Carolina Press Association's Executive Director Bill Rogers as saying, "they essentially divided into committees to get around the law, but they didn't. Committees are also open and must give notice of their meetings." On information and belief, Patel and Lee instigated these illegal and improper meetings.

112.    Continuing, the newspaper reports that in interviews with the Times, Patel and Eddie Lee confirmed they participated in closed sessions to discuss drafting the letter with Anderson. Both Patel and Lee confirmed that a consensus was reached in two separate closed sessions to avoid a quorum present, which would have also violated the state's open meetings law. "We went out of our way to make sure there was never a quorum," Patel said. Lee was quoted saying, "we all decided in separate meetings to proceed with the letter being written by Mr. Anderson."

113.    Patel and Lee as members of Town Council here admit to conspiring with Anderson to falsely accuse someone of theft and then publish the accusations after a series of illegal non- quorum meetings.

114.    Not surprisingly, the Town fired Anderson in November of 2015 for "insubordination." The South Strand news article dated November 6, 2015 and entitled, "Andrews Town Council fires financial adviser," quoted Mayor Giles as follows:

115.    "He stood before council and the citizens of this town and told us that there had been serious reconciliation discrepancies in the area of employee deductions in excess of $75,000," Giles said, *"(Anderson) said it was a chief concern of his, and he also said that there was an astronomical amount of employee deductions in the police department that was going to have to be reimbursed. And he also said that funds had been removed from our books. This is a serious situation (and) that is what we hired him for. He is our accountant, and he refuses to provide us with documentation and that is insubordination."*

116.    Despite the firing of Anderson for his inability to substantiate any of his accusations regarding Charping's bookkeeping and accounting work for the Town, neither the Town nor South Strand has published a*ny retractions or apologies to Charping.*

117.    *The November 6, 2015, South Strand article noted, "Council members Angela*

26

*Anderson, Eddie Lee and Sudha Patel voted against [terminating Anderson]."*

118.   *On behalf of Charping, the undersigned has sought copies of the meeting minutes for Town Council meetings since January 1, 2013, and recorded audio of the Town Council meetings since February 1, 2015.* The audio recordings were requested on August 25, 2015, yet still have not been provided. The meeting minutes were requested on September 2, 2015, and also have not been provided. Numerous follow up emails and letters have been sent, and telephone messages left, yet still not one single page of any meeting minutes or any audio recording has been provided in response to these FOIA requests.

119.   Dorsey for the Town has apparently retained an attorney to respond to the FOIA.

120.   On March 3, 2014, in Jennifer Flowers v. Town of Andrews, Civil Action No. 2013- CP-22-00304, the Town was ordered to pay $3,359.00 for failure to respond to a FOIA request. In addition, the Town was ordered to comply with the FOIA. On information and belief, the same people involved in that case are handling this failed FOIA.

121.   As will be shown at trial and as was mostly, if not entirely, known by the Defendants, the repeated statements by the Town and its agents regarding Charping were false in at least the following respects:

(i)   There is not $75,000 in discrepancies in the Town's audited financial statements;

(ii)   There are no "secret deductions";

(iii)   The budget projections are based on assumptions asserted by Council;

(iv)   The books were not a "mess" as publicly proclaimed by Lee, they were always found to be in excellent order by the auditor(s);

(v)   There is no law in South Carolina limiting a contractor to 10 years as stated by Defendant Dorsey in the newspaper as a reason for terminating Charping. This was not the reason for terminating Charping. Charping was terminated for alleged theft and

27

incompetence based upon Council's reliance on the countless and baseless false and misleading statements from Anderson in the June 17, 2015 meeting for which Charping was excluded from attending, both of which are false;

(vi)    Charping was also terminated and these false reports circulated as a direct result of the desires of Defendants to have her terminated, and actions in concert to ensure that it occurred;

(vii)    There is no "book" in South Carolina informing governments of the revenue amounts for coming years as stated by Anderson in a news paper report, as Anderson has stated;

(viii)    The audited financial statements prepared by the auditor(s) are equal to the financial results in the Plaintiff's records, and any reports by Anderson and his affiliates of different numbers, discrepancies, etc., are false;

(ix)    SLED is not inclined to bypass any normal process of a forensic audit and go straight to the State Solicitor with any information allegedly provided by Anderson;

(x)    There is no investigation at SLED concerning Charping;

(xi)    There is not an astronomical amount of money owed to the employees due to incorrect deductions;

(xii)    Anderson didn't "discover deduction discrepancies." If he had, he could have produced work papers showing the detail for the Mayor upon request;

(xiii)    No one at the Town made any effort to protect the reputation of the Plaintiff as asserted by Anderson. To the contrary, every effort was made to hold public *secret public* hearings on any false assertions made by Anderson, Patel, Lee, Capers, and Dorsey that were characterized maliciously as "secret," "astronomical," and "of great magnitude;"

(xiv)    The Town knew or should have known at least as early as September 23, 2015, that no C.P.A. was supervising Anderson's work;

(xv)    There was no "fraud" by or associated with Charping in any way as repeatedly referenced as a theme of Anderson's June 17, 2015 presentation to Council;

(xvi)    There was no "misappropriation" by or associated with Charping in any way as repeatedly referenced as a theme of Anderson's June 17, 2015 presentation to Council; and

(xvii)    There were no "irregularities" in Charping's work as repeatedly referenced by Anderson during his June 17, 2015 presentation to Council.

122.    Numerous false statements by these Defendants as agents of the Town and acting on behalf of the Town were made regarding the Plaintiff causing damage to her reputation and to her company, GAS.

123.    Plaintiff was illegally excluded from the June 17, 2015 public meeting in violation of the S.C. FOIA and her constitutional rights.

124.    The Defendants present at the June 17, 2015, public meeting could have intervened when the Plaintiff was escorted out of the meeting, but they did not and in so doing, they knowingly violated and caused to be violated the Plaintiff's clearly established constitutional rights to hear and receive information disseminated in public forums and also violated her liberty interests in having the Chief of Police seize her and place her in a room to be supervised by other officers.

125.    Defendant Patel once attempted to videotape Charping at a public meeting in 2013 sticking a camera right in Charping's face and arguing with other, including Chief Capers, who had to threaten to arrest her to get her to allow Charping to continue to do her job to report to the Council on its financial affairs.

126.    Patel at that time in 2013 asserted she had a right to videotape Charping, presumably referring to the S.C. FOIA at S.C. Code § 30-40-100.

**FIRST CAUSE OF ACTION**
(Declaratory Judgment - Freedom of Information Act, S.C. Code § 30-4-10 *et seq.*) (Town of Andrews, Dorsey)

127.    The Plaintiffs re-allege each and every allegation of the preceding Paragraphs as if set forth herein verbatim.

128.    Plaintiff through her counsel sent proper requests under the S.C. Freedom of Information Act ("FOIA"). The first of which was sent on August 25, 2015. The second of which was sent on September 2, 2015, and a third was sent on September 10, 2015.

129.    The Town's first response at all to these FOIA's was dated September 21, 2015, which is 32 days after the initial request was sent and received by email, and by U.S.

Mail. The Town failed to respond within the required time period, even though the deadline of September 14, 2015, was specifically set forth to them in the initial FOIA request letter.

130.    The Town has additionally attempted to thwart the Plaintiff's access to their public records by requesting an excessive copying fee up front, then ignoring the limited request of the Plaintiff's FOIA to only certain *meeting minutes* and *audio recordings*. As noted to the Town, many municipalities make their meeting minutes available online for no charge, and certainly these limited *meeting minutes* documents are readily available in the Town's offices.

131.    Instead, the Town through its attorney has produced the documents that Plaintiff either did not request or that were unresponsive to any of the Plaintiffs' FOIA requests, while continuing to withhold the limited requests to what are assuredly readily available *meeting minutes* and *audio recordings*. In one such document provided by the Town in response to the FOIA, in response to an email from Dorsey suggesting hand delivery of the check to Charping for her final payment on the contract, Defendant Anderson emails Defendant Dorsey on July 2, 2015, and states with respect to Charping and her again providing of the digital financial records to the Town, "Not sure if picking up the electronic file may change any 'tampering' or 'doctoring' of the books if this allegation may or may not exist. ... Please advise ..."

132.    Chief Capers is copied on this July 2, 2015, email from Anderson to Dorsey.

133.    The actions of the Town exemplify bad-faith and a refusal to comply with the FOIA, similar to those as set forth in the Court's order in the 2013-CP-22-00304 *Flowers* case identified above.

134.    The Town and its Administrator have intentionally refused to comply with the FOIA. Despite the fact that the initial written FOIA request did not identify Charping by

name, the Town responded to their counsel referring to "Wanda's attorney."

135.    On information and belief, others have been provided with these same documents or recordings, while with the exception of the audio recording of the morning session of the public meeting on June 17, 2015, the Town has sat on these documents and information since approximately September 13, 2015, and refused to provide them to the Plaintiff and also has refused to acknowledge or respond to Plaintiff's limited request for the *meeting minutes* and *audio recordings.*

136.    On information and belief, the Plaintiff's FOIA was treated differently than other FOIA requests, including but not limited to being one of the first such FOIA's to be singled out for payment of copy costs, which are unreasonable and not supported by records of the time allegedly spent gathering the documents.

137.    As a result, Plaintiff has been deprived of the ability to review the publicly available *meeting minutes* and *audio recordings*, and has been prejudiced and delayed in her investigation into the events by same.

138.    Under S.C. Code § 30-4-100 and S.C. Code § 15-53-10 *et seq.*, the Uniform Declaratory Judgments Act, Plaintiff has been irreparably harmed by these actions of the Defendant Town and is entitled to an order from this Court declaring the Town in violation of the FOIA, requiring the Town comply with the FOIA, and also for the Plaintiffs to recover their costs and reasonable attorneys' fees in seeking these readily accessible documents and recordings.

### SECOND CAUSE OF ACTION
(Declaratory Judgment - Freedom of Information Act, S.C. Code § 30-4-10 *et seq.*) (Town of Andrews, Patel, Chris Anderson, Lee, Dorsey, Capers, Mayor Giles, Angela Anderson, Greene and McGee)

31

139.   The Plaintiffs re-allege each and every allegation of the preceding Paragraphs as if set forth herein verbatim.

140.   The Plaintiff was scheduled to present at the June 17, 2015, public meeting, and received an email notice to attend the Budget Workshop public meeting the day before.

141.   In the early stages of the meeting, as can be heard on the audio tape recording of the meeting, people ask if Wanda will be there, and those comments are followed up with instructions from one of the male voices to "guard the door."

142.   On information and belief, this instruction was made to Chief Capers, who did in fact, "guard the door," to keep Wanda Charping from being present to attend the meeting and exercise her rights to participate in public matters and to "reason with" others regarding the subject of her own professional accounting work.

143.   Charping did not know at the time that the portion of the meeting that she was excluded from was public and only learned of the contents of the proceedings in greater detail upon receipt of an audio tape of the June 17, 2015 meeting requested in 2015 pursuant to the FOIA, and provided on April 27, 2015, the day of the first deposition taken in this case.

144.   As a result of her being denied access to this public meeting, Charping has suffered irreparable harm as set forth in the S.C. FOIA at S.C. Code § 30-40-100, and she is entitled to an award of her attorneys' fees and costs and an order prohibiting the Town of Andrews and these Defendants from excluding persons from public meetings in the future.

145.   These Defendants, as public officials frequently conducting meetings in accordance with the FOIA, were trained in compliance with the FOIA, and knew their conduct violated the FOIA, and the constitutional rights of Wanda Charping.

146.   At approximately 27:52 into the meeting on June 17, those in attendance can

be heard discussing this is an "employment matter," and Chris Anderson even is heard stating he requested this meeting be an "Executive Session," others then say this is for "employees only."

147.    On information and belief, this was the recorded portion of the meeting when Capers did, in fact, intercept Charping upon her innocent attempt to attend the public meeting for which she was given notice of and asked to attend, and deny her access to the public meeting.

148.    A copy of the Town's meeting minutes which the Plaintiffs obtained from sources other than the Town is attached here as Exhibit A and shows that the Town's public meetings on June 17, 2015 included a first session from which Wanda Charping was excluded, an Executive Session and a Budget Workshop.

149.    These meeting minutes show that the first meeting started at 10:30 A.M., and the Budget Workshop was adjourned at 3:43 P.M.

150.    As a result, Plaintiff has been deprived of the ability to review the publicly available *meeting minutes* and *audio recordings*, and has been irreparably harmed and severely prejudiced and delayed in her investigation into the events by same.

151.    Under S.C. Code § 30-4-100 and S.C. Code § 15-53-10 *et seq.*, the Uniform Declaratory Judgments Act, Plaintiff is entitled to an order from this Court declaring the Town in violation of the FOIA, that she has been irreparably harmed, requiring the Town comply with the FOIA, and also for the Plaintiffs to recover their costs and reasonable attorneys' fees in seeking these readily accessible documents and recordings.

### THIRD CAUSE OF ACTION
(False Imprisonment - Mayor Giles, Chief Capers, Patel, McGee,
A. Anderson, Lee, Dorsey, and Greene)

152.    The Plaintiffs re-allege each and every allegation of the preceding Paragraphs

as if set forth herein verbatim.

153.    This claim is as against those Defendants acting under color of law and attending and participating in the June 17, 2015 public meeting for which Charping was seized and excluded from attending.

154.    On June 17, 2017, Wanda Charping was requested by Mayor Giles to leave the then proceeding public meeting that had been called to order, and, believing it to be an Executive Session, she politely complied with the Mayor's request and was later escorted out of Mayor's adjacent office and into another room by Chief Capers where he shut the door and told her *someone would come and get her*.

155.    Upon being escorted out of the public meeting, Wanda Charping was first placed in the Mayor's office by Chief Capers, and then put in one of the clerk's offices further away from the room where the public meeting was taking place, the door was shut by Capers and Chief of Police Capers told her, "someone will come and get you."

156.    Wanda Charping was restrained by Chief Capers and under the instructions from the Mayor acting pursuant to their official capacities.

157.    Wanda Charping had just as much right as any other person to attend the then proceeding public meeting on June 17, 2015 of the Andrews Town Council.

158.    The restraint of Wanda Charping was unlawful, and it lasted for at least an hour while the other members of the public, law enforcement, Mr. Anderson, the Mayor and Council members and Town Administrator continued to participate in the public meeting where Chris Anderson built his one-sided, self-serving case for why Wanda Charping's professional work was suspect and needed to be the subject of a forensic audit by the Town and that the audit should be conducted by none other than himself.

159.    Towards the end of the first public meeting session, as it is being discussed

34

about whether or not to go into an Executive Session, the audio recording shows that the very persons named as Defendants in this action that excluded Wanda Charping from the June 17, 2015 public meeting knew that she had a right to be in the public meeting.

160.    As a result of these incredible acts in violation of state and federal laws, Plaintiff Wanda Charping is entitled to recover her actual damages and punitive damages as will be shown at trial.

### FOURTH CAUSE OF ACTION
(Defamation – Slander)
(Chief Capers)

161.    The Plaintiffs re-allege each and every allegation of the preceding Paragraphs as if set forth herein verbatim.

162.    On June 12, 2015, immediately following an executive session of the Town Council in which Anderson gave his report of his initial findings, Chief Capers publicly and maliciously stated that all of the Plaintiff's accounting was wrong.

163.    This statement was false and made, at best, with a reckless disregard for the truth.

164.    This statement alone by Defendant Capers directly and proximately caused severe, extensive and irreparable damage to the Plaintiffs' reputation, including great stress and mental suffering, as well as economic damages, including, but not limited to, actual, general, and special damages.

165.    Due to the nature of the statements and the reckless manner in which they were made, Plaintiffs are also entitled to an award of punitive damages.

### FIFTH CAUSE OF ACTION
(Defamation – Slander)
(Anderson and Dorsey)

166.    The Plaintiffs re-allege each and every allegation of the preceding Paragraphs

as if set forth herein verbatim.

167.    On information and belief, Anderson and Dorsey, accused Charping of theft related to the matters set forth above wherein the Town clerk employee was accused of stealing, but later re-hired after the readily available explanation related to the "check stock," was provided.

168.    These false allegations of theft related to the Plaintiffs, and were defamatory.

169.    These statements by Defendants Dorsey and Anderson directly and proximately caused further severe, extensive and irreparable damage to the Plaintiffs' reputation, including great stress and mental suffering, as well as economic damages, including, but not limited to, actual, general, and special damages.

170.    Due to the nature of the statements and the reckless manner in which they were made, with no evidence to support the statements, Plaintiffs are also entitled to an award of punitive damages.

## SIXTH CAUSE OF ACTION
(Defamation – Slander)
(Eddie Lee)

171.    The Plaintiffs re-allege each and every allegation of the preceding Paragraphs as if set forth herein verbatim.

172.    In a public meeting, Lee mockingly referred to the accounting and book-keeping work of Charping for the Town as a "mess."

173.    This statement was known to refer to Charping and her accounting work as it was well known to all that she had provided accounting services to the Town since 2007. Lee knew or should have known this was false because he knew of the audits of Charping's professional work for the Town.

174.    This statement alone by Lee was made with malice towards Charping and

with reckless disregard for how it would reflect upon her professional work as a C.P.A. for the Town.

175.    This statement by Lee directly and proximately caused further severe, extensive and irreparable damage to the Plaintiffs' reputation, including great stress and mental suffering, as well as economic damages, including, but not limited to, actual, general, and special damages.

176.    Due to the nature of the statements and the reckless manner in which they were made, with no evidence to support the statement, Plaintiffs are also entitled to an award of punitive damages.

## SEVENTH CAUSE OF ACTION
(Defamation – Libel and Slander)
(Anderson, Dorsey, Capers, Lee, Patel and Lipe)

177.    The Plaintiffs re-allege each and every allegation of the preceding Paragraphs as if set forth herein verbatim.

178.    On information and belief, Anderson and Lipe's alleged investigative report(s), including as reported to Council by Anderson on June 17, 2015, included numerous false accusations related to the Plaintiff, up to and including allegations of criminal misconduct that rose to the level of SLED allegedly "by-passing" their normal procedures.

179.    These accusations, on information and belief, were the subject of both written reports and talk that was defamatory of the Plaintiffs.

180.    The information in these reports of Anderson and his associated team of auditors  have been published and / or otherwise provided to persons and sources outside of the Town in a manner that has caused still further damage to the Plaintiffs' reputation and with no ability of the Plaintiffs thus far to address or respond to the allegations and their

falsity.

181.    Anderson was motivated to make these comments as he was the person that stood to gain financially, and did gain financially, from taking over the accounting work for the Town from the Plaintiffs, and, as such, he made the statements with malice and a reckless disregard for the truth.

182.    These false allegations of theft related to the Plaintiffs, and were defamatory.

183.    These statements in the reports of Anderson and his associated team of auditors were adopted and or attested to by the other individual Defendants other than Anderson on behalf of themselves and the Town, and Charping was terminated before she even knew what took place in the June 17, 2015 meeting.

184.    These statements by Anderson and as adopted and repeated by the other individual Defendants directly and proximately caused further severe, extensive, permanent and irreparable damage to the Plaintiffs' reputation, including great stress and mental suffering, as well as economic damages, including, but not limited to, actual, general, and special damages.

185.    Due to the nature of these statements and the reckless manner in which they were made, with no evidence to support the statements, Plaintiffs are also entitled to an award of punitive damages.

## EIGHTH CAUSE OF ACTION
(Defamation – Libel and Slander)
(Anderson and Lipe)

186.    The Plaintiffs re-allege each and every allegation of the preceding Paragraphs as if set forth herein verbatim.

187.    On information and belief, Anderson repeated numerous similar defamatory allegations similar to those as set forth in his July 20, 2015 email to Jamal Smith with the

Department of Administration, and to persons such as Bill Taylor with the MASC, as noted in his discovery responses.

188.    These allegations regarding the Plaintiff directly related to her professional reputation and constitute defamation *per se*.

189.    The information in these reports of Anderson and his associated team of auditors have been published and / or otherwise provided to persons and sources outside of the Town in a manner that has caused still further unknown and perhaps undiscoverable damage to the Plaintiffs' reputation and with no ability of the Plaintiffs thus far to address or respond to the allegations and their falsity.

190.    Anderson received a pecuniary gain from his statements regarding Charping.

191.    Due to the nature of these statements and the reckless manner in which they were made, with no evidence to support the statements, Plaintiffs are also entitled to an award of punitive damages.

## NINTH CAUSE OF ACTION
(Civil Conspiracy)
(Anderson, Dorsey, Capers, Lee, Patel and Lipe)

192.    The Plaintiffs re-allege each and every allegation of the preceding Paragraphs as if set forth herein verbatim.

193.    These Defendants, on information and belief, by their conduct as described above, combined for the purpose of injuring the Plaintiff Wanda Charping.

194.    In addition to the damages as a result of the other causes of action, the Defendants' combination for the purpose of injuring the Plaintiffs directly and proximately caused special damages, including but not limited to attorneys' fees and costs of pre-litigation and post-litigation investigation of the Defendants' wrongdoing, interests costs,

costs of filings, any experts costs, loss of time running the business, loss of reputation and business reputation, loss of opportunity lost market share, lost sales, lost profits, loss of value in the company, and Plaintiffs are also entitled to punitive damages on this civil conspiracy claim.

## TENTH CAUSE OF ACTION
(Intentional Interference with Contract)
(Anderson, Dorsey, Capers, Lee, Patel and Lipe)

195.    The Plaintiffs re-allege each and every allegation of the preceding Paragraphs as if set forth herein verbatim.

196.    The Defendants knew that the Town had a contract with the Plaintiff, GAS, and that Charping was the singular principal of GAS.

197.    The Defendants intentionally procured a breach of this contract.

198.    These Defendants actions as set forth herein were not justified.

199.    These Defendants' conduct directly and proximately caused the Plaintiff GAS injuries and damages, including, but not limited to, actual, direct, and consequential damages, and warrant the award of punitive damages.

## ELEVENTH CAUSE OF ACTION
(Negligence / Gross Negligence)
(Lipe and Lipe, LLC)

200.    The Plaintiffs re-allege each and every allegation of the preceding Paragraphs as if set forth herein verbatim.

201.    The Lipe Defendants by their actions as described herein created a special relationship with the Town and owed a duty of care to the Town and to those persons and individuals that they knew or should have known would be included in any investigation related to the "forensic audit," to be performed by Anderson and his team of associated auditors, and attested to by them. They were negligent in their failure to exercise due

professional care.

202.    The Lipe Defendants breached this duty of care, and failed in all respects to follow and adhere to generally accepted auditing standards and supervise the work of Anderson.

203.    On information and belief, even after becoming aware that Anderson's and the other Defendants' primary objective was to displace Charping in favor of Anderson, Lipe took no action to correct the representations by Anderson to the Town with respect to Charping or to correct the record regarding the accuracy of her work.

204.    Lipe's actions caused damage to the Plaintiffs as set forth herein.

205.    The Lipe Defendants' conduct directly and proximately caused the Plaintiff GAS and Charping injuries and damages, including, but not limited to, actual, direct, and consequential damages, and warrant the award of punitive damages.

## TWELFTH CAUSE OF ACTION
(Negligent Supervision)
(Lipe and Lipe, LLC)

206.    The Plaintiffs re-allege each and every allegation of the preceding Paragraphs as if set forth herein verbatim.

207.    The Lipe Defendants represented to the Town and to the Mayor and Council that they would be supervising the work of Anderson.

208.    The Lipe Defendants failed to adequately supervise Anderson with respect to his work for the Town.

209.    On information and belief, Lipe shortly thereafter realized that Anderson was dangerous, and further that Anderson's intent was to cause harm to Charping and GAS.

210.    The Lipe Defendants admitted that Anderson was on a "witch hunt" for Charping and further that he was relentless and dangerous.

211.    The Lipe Defendants breached their duties owed to the Town and to those closely associated with the Town, and failed in all material respects to supervise the work of Anderson, and to protect those that they knew all along were associated with the Town, including specifically Charping.

212.    The Lipe Defendants' conduct in failing to supervise Anderson's work for the Town directly and proximately caused the Plaintiff GAS and Charping injuries and damages, including, but not limited to severe emotional distress and anxiety of the Plaintiff Wanda Charping, as well as actual, direct, and consequential damages.

213.    These actions in reckless disregard for Charping and others warrant the award of punitive damages.

## THIRTEENTH CAUSE OF ACTION
(Fed. Civil Rights, 42 U.S.C. § 1983 – 4th & 14th Amendments, Illegal Seizure & Detention)
(Giles, Capers, Dorsey, Patel, Anderson, Lee, Ms. Anderson, McGee and Greene)

214.    The Plaintiff re-alleges each and every allegation of the preceding Paragraphs as if set forth herein verbatim.

215.    On June 17, 2015, the individual Defendant Capers, acting under color of law and upon the instruction, on information and belief, of Mayor Giles, illegally seized the Plaintiff when she arrived at the ongoing public meeting and first put her in the Mayor's office, then put her in a clerk's office and told her, "someone will come and get you."

216.    Any one of these officials in attendance at the June 17, 2015 public meeting could have intervened and stopped Mayor Giles and Chief Capers from removing Wanda Charping in violation of her constitutional rights, but they failed to do so.

217.    On information and belief, Charping is the only person that has ever been required to leave an ongoing public meeting of the Town of Andrews.

218.    The Plaintiff was not under arrest for any crime and she was not being

42

detained for purposes of any imminent or emergency investigation.

219.    The Plaintiff was not a threat to anyone and there was never any probable cause to arrest her or seize her person and confine her in an office as she was at all times free to attend the ongoing public meeting for which she had received notice to attend.

220.    The Defendants knew that the Plaintiff had a right to be in the meeting, but excluded her illegally and in violation of her clearly established First Amendment rights to hear the ongoing public debate, which amazingly was Anderson's critique of her professional work and reputation for the Town in his quest to slander her name, have her fired and take her position based upon wholly false pretenses, and against the advice of the very CPA, Defendant Lipe, that he had been touting to the Town as his colleague and co-worker in his efforts.

221.    Defendant Capers improperly and illegally seized Wanda Charping and prevented her from attending and participating in the public meeting taking place on June 17, 2015.

222.    Capers and the other responding public officials present at the June 17, 2015 meeting, at approximately 11:00 A.M. were acting under color of state law and directed Capers, who was in his Police Chief uniform, to act as such.

223.    As a direct and proximate result of the individual Defendants' objectively unreasonable acts in violation of the 4th and 14th Amendments and / or their willful, malicious, conscious and deliberate indifference in violation of the Fourteenth Amendment, Capers and the other public officials have violated the United States Constitution and Statutes of the United States, and the state of South Carolina.

224.    Plaintiff knew of some of these facts, but only upon being provided with one single tape recording of the June 17, 2015 public meeting on April 26, 2016 (the day of the

43

Lipe deposition in this case) and in response to her counsel's FOIA request for same sent to the Town in August and September of 2015, did she become aware of the statements and directives given to Capers regarding her presence at the public meeting.

225.    These acts of the Defendants in callous disregard for Plaintiff's constitutional rights and the S.C. Open Records or FOIA laws, are a disgrace to the very fabric of American culture, the Constitution, the Declaration of Independence, and are the beginning of a culture of secret government action and corruption that cannot be tolerated.

226.    As a result, the Plaintiff has needlessly suffered mental and physical suffering, loss of her reputation, and other damages as will be shown at trial.

227.    Plaintiff is entitled to actual, consequential, and punitive damages, as well as her reasonable costs of this action attorneys' fees under 42 U.S.C. §1988.

### FOURTEENTH CAUSE OF ACTION
(Fed. Civil Rights, 42 U.S.C. § 1983 – 1st & 14th Amendments, Freedom to Speak & Hear)
(Giles, Capers, Dorsey, Patel, Anderson, Lee, Ms. Anderson, McGee and Greene)

228.    The Plaintiff re-alleges each and every allegation of the preceding Paragraphs as if set forth herein verbatim.

229.    During the time period in question, these Defendants were acting under the color or pretense of law, customs, practices, usage or policy at all times mentioned herein and had certain duties imposed upon them with regard to Plaintiff.

230.    Additionally, during the time period in question, specifically on June 17, 2015, these Defendants were well aware of the Plaintiff's constitutional rights, including but not limited to her right of access to public information, right to participate in public debates, not to mention her innate right to defend her work and her professional reputation, which was being secretly destroyed by Anderson and the other Defendants who lacked the courage to give Charping the right to respond to the baseless and now proven to be false allegations.

231.    The above set forth incidents and the Plaintiff's resulting injuries, sufferings,

and damages were proximately caused by the intentional, reckless, willful and wanton acts of

the Defendants in the following particulars:

      a.  In consciously, deliberately, and knowingly failing to follow and adhere to the training one or more of the Defendants had received regarding access to public meetings;

      b.  In consciously, deliberately, and knowingly engaging in further manipulation of the Plaintiff, specifically denying her access to the June 17, 2015, public meeting under false pretenses and by closing her in two rooms prior to the Police Chief advising her, someone would come and get her;

      c.  In consciously, deliberately, and knowingly engaging in a pattern and practice of failing to provide access to public records and public meetings in violation of Plaintiff's statutory and constitutional rights.

232.    The injuries inflicted upon the Plaintiff at the hands of the Defendants have

caused and continue to cause her damages, including mental anguish, and pain and suffering,

as will be shown at trial.

233.    Plaintiff is entitled to actual, consequential, and punitive damages, as well as

her reasonable costs of this action attorneys' fees under 42 U.S.C. §1988.

### FIFTEENTH CAUSE OF ACTION
(Federal Civil Rights, 42 U.S.C. § 1983 – 1st Amendment, Freedom of Association)
(Giles, Capers, Dorsey, Patel, Anderson, Lee, Ms. Anderson, McGee and Greene)

234.    The Plaintiff re-alleges each and every allegation of the preceding Paragraphs

as if set forth herein verbatim.

235.    During the time period in question, these Defendants were acting under the

color or pretense of law, customs, practices, usage or policy at all times mentioned herein

and had certain duties imposed upon them with regard to Plaintiff.

236.    On June 17, 2015, these Defendants did cause the Plaintiff to be sezed and her

personal liberty restrained and placed her in a closed room while other members of the

45

public were free to attend the ongoing public meeting.

237.    The above set forth incidents and the Plaintiff's resulting injuries, sufferings, and damages were proximately caused by the intentional, reckless, willful and wanton as set forth herein.

238.    The injuries inflicted upon the Plaintiff at the hands of the Defendants have caused and continue to cause her damages, including mental anguish, and pain and suffering, as will be shown at trial.

239.    Plaintiff is entitled to actual, consequential, and punitive damages, as well as her reasonable costs of this action attorneys' fees under 42 U.S.C. §1988.

WHEREFORE, the Plaintiffs pray for a judgment against these Defendants in an amount to be determined by the jury for its damages caused by these defendants as set forth herein, including compensatory, actual, general, special, consequential, and punitive damages, as well as any award of attorneys' fees, costs, pre-judgment interest, and other relief requested herein and deemed just and proper by this Court under these circumstances.

Respectfully submitted,

WESLEY D. FEW, LLC

Wesley D. Few, S.C. Bar No. 15565
1527 Blanding Street, Suite 203
Post Office Box 11546 (29211)
Columbia, South Carolina 29201
(803) 223-6942
wes@wesleyfew.com

ATTORNEYS FOR PLAINTIFFS

Columbia, South Carolina

June **13**, 2016

46



**PLAINTIFF'S EXHIBIT**

*A* (4 pages)

2nd Am. Comp.

**Town of Andrews**

2015-CP-22-01172

## Special Called Meeting/Budget Workshop
## Wednesday, June 17, 2015
## 10:30 a.m.

**Town Hall Courtroom**                **101 N Morgan Ave. Andrews, SC**

The Town of Andrews met for a Special Called Budget Workshop on Wednesday, June 17, 2015 at 10:30 am. Mayor Rodney Giles presiding in compliance with the Freedom of Information Act, called the meeting to Order at 10:30 am.

Invocation was rendered by Mr. Christopher Anderson
Pledge of Allegiance was recited by everyone present.

### Town Officials Present:

Mayor Rodney Giles
Council Member Eddie Lee
Council Member Angela Anderson
Council Member Sudha Patel
Council Member Patsy Greene
Council Mattie McGee

### Appearance(s)

**Mr. Christopher Anderson, Account & Wealth Management Firm:** Mr. Anderson introduced to Mayor and Council, Mr. Gregg Lipe a Certified Public Accountant of Lipe & Associates LLC from Florence, SC. Mr. Anderson stated to Council that they received a P&L Statement on Thursday, May 2015 dates as of April 30, 2015 from the Town's CPA, Wanda Charping and seven days later they received another P&L Statement dated as of April 30, 2015. Mr. Anderson goes on to say that in his reviewing of the two P&L Statements he saw that the Administration Department was showing a $75,000.00 deficit and this prompt him to performing a preliminary forensic audit.

Special Called Meeting/Budget Workshop
Wednesday, June 17, 2015
Page 3

$54,508.70 however, the actual total is $48,863.23 thus there is a difference of $5,645.47.

The total operating expenses for the Police Department is in fact recorded correctly, as $96,838.36, thus ruling out the possibility that a formula was used to compute the totals which may have been formatted incorrectly. The Victims Fund operating expenses was computed correctly as $105.00. The Streets and Sanitation Department total for operating expenses is $97,003.89. Building Inspection total operating expenses on the report has been computed correctly and the actual total is $10,797.05. After careful reviewing and analyzing of each sub department operating expenses under the General Fund Account it is concluded that the actual total operating expense totals $526,468.81. At the end of the comparison of total operating expenses there is a difference of $17,600.00 from year to date that goes unexplained. It appears that a reclassification of $4,689.00 in expenses has a credit but there is no corresponding debit in that amount shown on the statement. Mr. Anderson states that he is not drawing any conclusions or expressing any opinion.

## Executive Session

The motion was made by Council Member Mattie McGee and seconded by Council Member Eddie Lee to go into an Executive Session to discuss Personnel Matters and the Public Works Department.

The motion was made by Council Member Eddie Lee and seconded by Council Member Patsy Greene to come out of Executive Session.

Mayor Giles stated that there was no decision rendered during Executive Session as it pertains to Personnel Matter and the Public Works Department.

The motion was made by Council Member Angela Anderson and it was seconded by Council Member Sudha Patel that the Town of Andrews have a Forensic Audit performed based on our procurement policy and if the job does not have to be bidded out then the job offer should be extended to Christopher Anderson & Wealth Management Firm.

**Special Called Meeting/Budget Workshop**
**Wednesday, June 17, 2015**
**Page 2**

Mr. Anderson stated that during todays meeting he will discuss his findings. He began by giving an explanation of the accounting process for better understanding of the information he is providing. It is the accountant's job to understand the financials reports and interpret the information and provide an understanding to the governing body.

Mr. Anderson stated that the source document that was provided on May 28, 2015 during the Special Called Meeting shows the general funds total operating expense was $508,868.81, however in adding the totals from each department that makes up the general fund account the total is actually $526,468.81. The $17,600.00 difference shows an overstatement of operating expenses. Mr. Anderson gave the following disclaimer: that he is not pointing any fingers, he is not stating there are any irregularities, and he is not suggesting that there are any misappropriations or is he suggesting that there are any fraudulent activity. Mr. Anderson stated that he is suggesting there are reasons for further investigation based upon his findings.

It was established that the two P&L Statements that were provided to the Council were indeed dated for the same time period as of year to date April 2015. These statements were issued approximately more than 15 days after the closing of April 30, 2015 therefore, any adjusting entries that needed to be made should have been made by this time. Normally all adjusting entries are made 15 days after month closing and 90 days if a financial was being prepared. Mr. Anderson stated that after reviewing the two P&L Statements and discovering a $75,000.00 deficit in the Administration Department that would show up by the end of this fiscal period. He created a worksheet to show a comparison of the two P&L Worksheets and it was established that the worksheet is in fact in balance with the two P&L Statements that were provided by Ms. Charping.

In further review of the two statements it was discovered that item #6100 total operating expenses totals $49,790.65 and the actual total should be $42,626.14 for Mayor and Council and there should not be a difference of $7,164.51. The total operating expenses for the Fire Department shows on the statement as

Special Called Meeting/Budget Workshop
Wednesday, June 17, 2015
Page 4

Council Member McGee; Yes, Council Member Eddie Lee; Yes, Council Member
Sudha Patel; Yes, Council Member Angela Anderson; Yes, Council Member Patsy
Greene; Yes, Mayor Giles; Yes. Motion carried.

## Budget Workshop

**Water & Sewer Department:** Ms. Charping stated to Mayor and Council that this
department is experiencing a lot of overheard due to cost associated with the
operation of the sewer system. It was suggested that council anticipate
implementing a rate increase in the near future to help offset the cost associated
with running the system. Council stated that they want to add $80,000.00 to the
budget to cover true up cost. The proposal for raises are to be taken out of the
budget. Council once again requested a line by line itemized report of the current
budget broken down from Ms. Charping. Ms. Charping stated that Council needs
to cut the budget by $300,032.00 to balance the budget.

The motion to adjourn was made by Council Member Eddie Lee and seconded by
Council Member Angela Anderson at 3:43

Minutes submitted by Chaconas Parson, Town Clerk

Anderson 000295